IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PHILIP J. GARCIA,

       Plaintiff,

v.	CV 13-0214 WPL

CAROLYN W. COLVIN, *Acting Commissioner*
*of the Social Security Administration*,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Philip J. Garcia filed an application for Disability Insurance Benefits ("DIB") payments on January 14, 2010. (Administrative Record ("AR") 79.) He alleged that he had been disabled from June 15, 2009,[1] due to lower back problems and cerebral palsy. (AR 164.) Administrative Law Judge ("ALJ") Ben Willner held a hearing on his application on August 23, 2011. (AR 21.) He denied Garcia's application, determining that Garcia was not under a disability as defined by the Social Security Act and therefore not entitled to benefits. (AR 32.) Garcia requested review by the Appeals Council, but that request was denied, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-3.)

Garcia sought a review of the SSA's decision (Doc. 1) and filed a motion to reverse and remand for rehearing (Doc. 19). The Commissioner of the SSA ("Commissioner") responded (Doc. 22), and Garcia filed a reply (Doc. 24). After having read and carefully considered the

---

[1] It appears that the SSA previously denied DIB payments to Garcia on September 12, 2009. (AR 160-61.) References made to any medical documents or claims dating from before June 15, 2009, are done for historical reasons and are not intended to reopen any prior claim.

entire record and the relevant law, I grant Garcia's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall*, 561 F.3d at 1051-52; 20 C.F.R. §§ 404.1520, 416.920 (2013). If a finding of disability or nondisability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment

or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Garcia, age forty-six, worked as a school custodian for approximately fifteen years. (AR 149, 166.) After leaving that job in March 2009, he worked as a stocker at Wal-Mart for approximately three months. (AR 166.) His potential disability onset date was June 15, 2009, which was also the end of his last period of employment. (AR 160.)

In early July 2009, Garcia underwent a physical examination by Robert Urrea, M.D., presenting with back and bilateral leg pain and numbness along the buttocks and thighs. (AR 282.) He stated that he had suffered from lumbar pain for twenty years and that the pain had worsened one year earlier, and he complained that prolonged sitting, bending, lifting, or pushing aggravated his symptoms. (*Id.*) He also reported a past history of cerebral palsy, hypertension, and diabetes. (*Id.*) Dr. Urrea diagnosed Garcia with lumbago and lumbar radiculopathy and proposed a conservative treatment plan with anti-inflammatory medications. (AR 284.) Although Garcia's weight is not mentioned, Dr. Urrea recommended that he lose weight to alleviate his symptoms. (*Id.*)

On July 15, 2009, Garcia reported off-and-on lower back pain to George O. Williams, D.O. (AR 269.) Garcia's weight is listed as 345 pounds, and Dr. Williams described him as "GROSSLY OBESE." (AR 270 (emphasis in original).) Dr. Williams assessed Garcia with hypertension, back pain, and diabetes mellitus type II, among other ailments. (*Id.*) The next day, Garcia underwent an MRI and CT scan of the lumbar spine, which revealed calcified disc protrusions of several vertebrae that in some cases contributed to minimal to moderately severe canal stenosis. (AR 277-78.) Reviewing these results, Dr. Urrea diagnosed Garcia with lumbar spondylosis and lumbar radiculopathy. (AR 276.) Dr. Urrea concluded that "[Garcia's] weight is causing a huge problem for him" and suggested the South Beach Diet. (AR 276.) At a follow-up visit on July 28, 2009, Dr. Williams assessed Garcia with spinal stenosis and degenerative disc disease, but Garcia stated that he was not looking to fuse his back despite the continuing back pain. (AR 267.)

Dr. Urrea gave Garcia an epidural injection on July 30, 2009. (AR 279-80.) Two weeks later, Garcia reported that the epidural had not relieved his lumbar pain and that he was suffering from nightly leg cramping. (AR 290.) Dr. Urrea prescribed regular use of anti-inflammatory medication and muscle relaxants, and he instructed Garcia "to be far more active and lose as much weight [a]s possible." (*Id.*) Nonetheless, Garcia reported to Dr. Williams in September 2009 that his back pain was the same, he suffered from spasms, and he had a hard time sleeping. (AR 294.)

Garcia applied for DIB payments on January 14, 2010. (AR 79.) His wife, filling out a function report on Garcia's behalf ten days later, described Garcia's days as mostly consisting of walking around the yard twice daily, helping with light cleaning, and watching television. (AR 186.) She stated that Garcia could help with dusting, cleaning the dishes and the cat's litter box,

4

doing the laundry, and watering trees, and once every other week he would pick up groceries. (AR 188-89.) She reported that Garcia's back pain led to trouble sleeping, that he struggled with many physical activities, that his cerebral palsy led to difficulties understanding and concentrating, that he read at a third-grade level, and that he was "extremely short-tempered." (AR 187, 190-91.)

The state disability office referred Garcia to Carmen M. Diaz, Ph.D., for a consultative examination. (AR 300.) Garcia told Dr. Diaz that he was applying for DIB payments because of his cerebral palsy and learning disabilities, though he also reported chronic back pain. (*Id.*) His weight was reported as 375 pounds. (AR 301.) Dr. Diaz described Garcia's intelligence as "in the borderline range," and she noted his difficulties with attention and recall, problems with articulation, and some confusion. (*Id.*) Based on Garcia's history and her own observations, Dr. Diaz included diagnostic impressions of cerebral palsy, diabetes, hypertension, gallbladder disease, degenerative disc disease, migraines, ADHD, and language, reading, and math disorders. (AR 302.) She also assessed Garcia's Global Assessment of Functioning ("GAF") score at fifty,[2] and she opined that he "may be quite limited" in the type of work he could perform. (*Id.*)

Relying on Dr. Diaz's report, non-examining agency consultant Jill Blacharsh, M.D., completed a mental RFC assessment of Garcia. (AR 304-06.) Dr. Blacharsh described moderate limitations in several respects, mostly involving problems with concentration, routine, detailed instructions, goal-setting, and interactions with coworkers, supervisors, and the general public. (AR 304-05.) She assessed Garcia with mild restrictions of daily living activities, and moderate

---

[2] The GAF is "a hypothetical continuum of mental health-illness" assessed through consideration of psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed., text rev. 2005). A score between forty-one and fifty is assessed when the patient is believed to have "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." *Id.*

difficulties in maintaining social functioning, concentration, persistence, or pace. (AR 318.) She concluded that Garcia could attend and concentrate for two hours at a time, interact adequately with coworkers and supervisors, respond appropriately to changes in routine work settings, make simple decisions, and understand, remember, and carry out simple instructions. (AR 306.)

Agency consultant Jose Ruben Ayala, M.D., completed a disability determination examination of Garcia on April 3, 2010. (AR 322.) There, Garcia reported that he could dress and feed himself and that he could complete most of his daily living activities. (AR 323.) He said that he could stand for ten minutes at a time and that he could only stand for ten minutes every eight hours. (*Id.*) He also stated that he could only sit for five minutes at a time, for a total of ten minutes over an eight-hour period. (*Id.*) He claimed that he could walk approximately twenty feet at a time and lift no more than five pounds, and he said he could only drive a vehicle for two continuous hours at a time. (*Id.*) Dr. Ayala observed normal range of motion of the upper extremities, cervical spine, hips, knees, and ankles; however, with respect to the lumbar spine, he also noted tenderness, flexion of seventy degrees, and lateral range of motion of ten degrees on the right and left sides. (AR 324.) Garcia had a slow gait, struggled to get on and off the examination table, and was unable to squat or complete a heel-to-toe walk. (*Id.*) Dr. Ayala concluded that Garcia suffered from cerebral palsy, low back pain, morbid obesity that exacerbated the back pain, and problems with reading, writing, and comprehension. (AR 325.)

Based on Dr. Ayala's work and previous examinations, non-examining agency consultant Eileen M. Brady, M.D., completed a physical RFC evaluation of Garcia on April 29, 2010. (AR 327-34.) With respect to exertional limitations, Dr. Brady determined that Garcia could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for two hours in an eight-hour workday, sit for six hours out of an eight-hour workday, and push or pull in an

unlimited fashion. (AR 328.) With respect to postural limitations, Dr. Brady concluded that Garcia could only occasionally perform all tasks. (AR 329.) She assessed no manipulative, visual, or communicative limitations, and other than recommending that Garcia avoid concentrated exposure to uneven surfaces, she found no environmental limitations. (AR 330-31.)

The next day, the SSA reached an initial determination that Garcia was not disabled, stating that he had the capacity for sedentary and unskilled work. (AR 79-80.) Garcia requested reconsideration, but he provided no new medical records, and the SSA affirmed the initial determination in June 2010. (AR 335-40, 342-47.)

Although Garcia was scheduled for an outpatient ultrasound in October 2010, the results of that procedure are not in the record. (*See* AR 348.) A May 2011 examination by Ronald Vigil, M.D., reports diagnoses of diabetes, obesity, fatty liver, obstructive sleep apnea, a history of gastroesophageal reflux, chronic back pain, hypertension, cerebral palsy, and lumbago. (AR 353.) An August 6, 2011 examination of the lumbar spine at the University of New Mexico Hospital showed mild disc narrowing at the L4-L5 vertebrae and spinous process abutment. (AR 389.)

### HEARING TESTIMONY

On August 23, 2011, the ALJ held an in-person hearing at which both Garcia and a vocational expert ("VE") testified. (AR 21.) Garcia was represented by an attorney. (*Id.*) Garcia testified that his weight had fluctuated up and down over the course of the past five years, but any losses usually return because his diabetes makes him hungry all day and night. (AR 43.) Although doctors had instructed him to try to walk or exercise, he said he is unable to walk half a block without suffering pain. (AR 44.) He also said he cannot sit for longer than fifteen minutes without pain (AR 46), and after driving his wife twenty to thirty miles to work on some

weekends, he usually has to get out and stretch, then ideally visit nearby friends or family rather than return the full distance. (AR 56-57.) Standing for longer than five minutes also causes pain, and Garcia often has to lean against walls or furniture to perform tasks that require standing. (AR 54.) He usually does not walk anywhere without a cane. (AR 61-62.) The pain causes him difficulty sleeping, getting out of bed, or doing much of anything other than lying down and watching television. (AR 53-54.) Garcia testified that he does not perform any chores around the house other than laundry, he is unable to squat or crouch if he drops something, and bending over and reaching overhead are difficult. (AR 62-63.)

      Although Garcia worked briefly for Wal-Mart as a stocker, his back went out at one point, and he said that his doctor would not allow him to return to work until his back improved, which never happened. (AR 49-51.) Garcia also testified that while he can handle simple tasks like reading off a shopping list, he struggles with any work involving reading, writing, or computers due to his disability, and he has trouble keeping track of his medication. (AR 46-49, 51, 58, 65-67.)

      After the ALJ and Garcia's attorney questioned Garcia, the ALJ spoke to the VE, Cornelius Ford, regarding Garcia's past work history and his ability to work in the future. (AR 69-71.) The VE testified that a hypothetical person with Garcia's age, education, and work history could not perform light exertional work, even if he were allowed to use a cane, and even if the work only required standing or walking for two hours a day, maintaining concentration and pace for two hours at a time, following simple instructions to perform simple tasks, interacting primarily with things instead of people, avoiding concentrated exposure to uneven surfaces, and only occasionally climbing, balancing, kneeling, stooping, crouching, and crawling. (AR 71-73.) However, the VE said that a person with these restrictions might be able to perform some work

at the sedentary exertional level, even if that person could only read and write at a third-grade level. (AR 73-74.) At the ALJ's prompting, the VE cited work as a buckler and lacer, a dowel inspector, or a label cutter as meeting these criteria. (AR 73.) Still, the VE noted that this hypothetical person would be unable to find even this work if he required breaks more frequently than once every two hours or if he needed to walk around every fifteen minutes for extended periods. (AR 74-75.)

## THE ALJ'S DECISIONS

The ALJ reviewed Garcia's claim pursuant to the five-step sequential evaluation process. (AR 22-23.) He first determined that Garcia had not engaged in substantial gainful activity since his onset date. (AR 23-24.) He then found that Garcia suffered from the following severe impairments: diabetes mellitus type II, obesity, degenerative disc disease, spondylosis and radiculopathy, mild borderline intellectual functioning, cerebral palsy, obstructive sleep apnea, and hypertension. (AR 24.)

At step three, the ALJ concluded that Garcia did not have an impairment or combination of impairments which met the criteria of listed impairments under Appendix 1 of the SSA's regulations. (AR 24-26.) In doing so, the ALJ expressly discussed each of the severe impairments cited at step two except for obesity and determined that none fit within the Appendix 1 listings. (*Id.*) With respect to obesity, the ALJ noted that it can cause limitation of function, but he said, "I have considered the effects of [Garcia]'s obesity and included those effects within the determination of the claimant's residual functional capacity." (AR 24-25.)

Proceeding to the next step, the ALJ concluded that Garcia possessed an RFC to perform "light work" that allows use of a cane when standing or walking, allows avoidance of concentrated exposure to uneven surfaces, and requires two hours of standing or walking out of

an eight-hour workday; two hours of concentration, pace, and persistence at tasks at a time before taking breaks; only occasional climbing, balancing, stooping, kneeling, crouching, or crawling; following simple instructions and performing simple tasks; and working primarily with things rather than people. (AR 26.) In reaching this RFC, the ALJ noted that three doctors had assessed Garcia with obesity, and he observed that Dr. Urrea and other doctors had encouraged Garcia to lose weight and increase his activity so as to cause less strain on his spine and reduce his overall symptoms. (AR 27, 29, 30.) Otherwise, the ALJ did not expressly mention obesity in conjunction with Garcia's other impairments or symptoms. (*See* AR 26-30.)

Relying on this RFC, the ALJ concluded that while Garcia could not perform any of his past relevant work, he was able to perform other jobs that exist in significant numbers in the national economy. (AR 30-32.) On that basis, the ALJ determined that Garcia was not disabled under the meaning of the Social Security Act and not entitled to benefits. (AR 32.)

### THE APPEALS COUNCIL'S DECISION

Garcia appealed the decision to the Appeals Council (AR 14-15), and he submitted new medical records through a new attorney (AR 4, 375-406). Included in those records were medical records from the University of New Mexico Hosptial diagnosing him with a fatty liver in September 2011 (AR 387-88) and with moderate disk bulges, moderate to severe spinal canal narrowing, and epidural lipomatosis in November 2011 (AR 385-86). Garcia also provided medical records from First Choice Community Healthcare dated October 2011 through February 2012, with diagnoses including fatty liver, chronic pain, and shoulder pain with limited range of motion and probable impingement. (AR 395-406.) However, the Council found that the additional information did not justify a review of the ALJ's decision, thus rendering the ALJ's decision the final decision of the Commissioner. (AR 1.)

**DISCUSSION**

The essence of Garcia's challenge is that the ALJ failed to adequately discuss his obesity and its impact (or lack thereof) on his impairments and functioning, either at step three of the sequential evaluation process or during the RFC analysis at step four. Although these questions are ultimately intertwined, I address them in that order.

**I.     Step Three**

Garcia argues first that the ALJ did not sufficiently consider the impact of his obesity on his other severe impairments at step three when he determined that none of these impairments met or were medically equivalent to a condition listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 19 at 9-12.) In his decision, the ALJ observed that "obesity can cause limitation of function" and stated that he had considered the effects of Garcia's obesity and included those effects within his RFC determination. (AR 24, 25.) The ALJ also cited each of the remaining severe impairments, commented on whether they met certain requirements in the Appendix 1 listings, and determined that none of them did so. (AR 24-26.) However, no other mention is made of Garcia's obesity during the ALJ's step-three analysis, and no medical or nonmedical evidence is cited in this discussion.

In arguing that the ALJ erred at this step, Garcia refers to Social Security Ruling ("SSR") 02-1p, which is relevant to an ALJ's assessment when a claimant alleges obesity. *See* 2002 WL 34686281, at *5 (Sept. 12, 2002). SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See* 20 C.F.R. § 402.35; *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

SSR 02-1p recognizes that while obesity is not itself a listing in Appendix 1, it may nonetheless be a factor in determining whether other severe impairments meet or equal a listing-level impairment at step three. *See* 2002 WL 34686281, at *5. "For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." *Id.* Moreover, obesity by itself may be medically equivalent to a listed impairment, such as when heightened obesity prevents effective ambulation as defined in Listing 1.00B2b or Listing 101.00B2b. *See id.*

Step three also requires an ALJ to discuss the evidence relevant to his determination and his reasons for reaching this determination. 42 U.S.C. § 405(b)(1); *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). A summary conclusion that a claimant's impairments do not meet or equal a listing-level impairment "is beyond meaningful judicial review" and must therefore be disregarded. *Clifton*, 79 F.3d at 1009. While the ALJ need not discuss every piece of evidence he relied on, the record must show that he considered all of the evidence. *Id.* (citations omitted). Still, a reviewing court must review the ALJ's decision "as a whole" in order to prevent "unwarranted remands [that would] needlessly prolong[] administrative proceedings." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 730 (10th Cir. 2005).

Garcia argues that the ALJ failed to sufficiently discuss his obesity and its effects on his impairments at step three, citing *Clifton*'s proscription against "bare conclusion[s]" that are "beyond meaningful judicial review." (*See* Doc. 19 at 11-12 (quoting *Clifton*, 79 F.3d at 1009).) It is true that the ALJ's analysis did not make any findings regarding the impact of Garcia's obesity on his step-three conclusions and did not discuss the medical evidence supporting these conclusions. (*See* AR 24-26.) Without more to justify his conclusions, the ALJ's analysis is indeed "beyond meaningful judicial review." However,

> where an ALJ provides detailed findings . . . that confirm rejection of the listings in a manner readily reviewable, requiring reversal would extend *Clifton* beyond its own rationale. Neither *Clifton*'s letter nor spirit require a remand for a more thorough discussion of the listings when confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review.

*Fischer-Ross*, 431 F.3d at 734. In other words, the ALJ's decision must be considered as a whole, and the lack of detailed findings and reasoning in the ALJ's step-three analysis does not require remand if the ALJ reached appropriate findings at later stages of his review. Accordingly, the next step is to review the ALJ's step-four discussion to see if the findings in that analysis justify his step-three conclusions. *See id.*

## II.    Step Four

The ALJ's evaluation of a claimant's physical and mental RFC constitutes the first of three phases of the step-four analysis. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (citing *Winfrey*, 92 F.3d at 1023). In one paragraph of his RFC determination, the ALJ acknowledged Garcia's obesity and noted that doctors told Garcia several times to lose weight and increase his activity. (AR 30.) Other than that paragraph, two brief references to Garcia's obesity diagnoses (AR 27, 29), and a few sporadic mentions of weight-loss recommendations (AR 27), the ALJ did not discuss obesity anywhere else in his RFC analysis and did not indicate how Garcia's obesity influenced his RFC assessment.

SSR 96-8p requires the ALJ at this stage to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . ." 1996 WL 374184, at *7 (July 2, 1996). SSR 02-1p, in turn, requires that an assessment be made

at step four "of the effect obesity has upon the [claimant]'s ability to perform routine movement and necessary physical activity within the work environment. . . . As with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations." 2002 WL 34686281, at *6-7. An ALJ may "not make assumptions about the severity or functional effects of obesity combined with other impairments"; instead, the ALJ must "evaluate each case based on the information in the case record." *Id.* at *6.

An unpublished Tenth Circuit case cited by Garcia, *DeWitt v. Astrue*, 381 F. App'x 782 (10th Cir. 2010), is on point. There, as here, the ALJ acknowledged the claimant's obesity as a severe impairment at the second step of the sequential evaluation process. *See id.* at 786. Further, the ALJ in *DeWitt* limited the claimant to sedentary work with other restrictions. *See id.* at 785. However,

> there [was] nothing in the [ALJ's] decision indicating how or whether [the claimant's] obesity influenced the ALJ in setting those restrictions. Rather, it appear[ed] that the ALJ's RFC assessment was based on "assumptions about the severity or functional effects of [DeWitt's] obesity combined with [her] other impairments"—a process forbidden by SSR 02-1p.

*Id.* (citing SSR 02-1p, 2000 WL 628049, at *6). Because of the ALJ's failure to adequately consider the claimant's obesity in relation to her other impairments and her RFC, the Tenth Circuit remanded the case. *Id.* at 786.

Here, the medical and nonmedical evidence cited by the ALJ provides significant support for the RFC assessment that Garcia should be restricted to light work with restrictions. In addition to Garcia's testimony, the ALJ relied on numerous medical records addressing all of Garcia's alleged severe and nonsevere impairments. (AR 27-30). However, "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p, 2002 WL 34686281, at *6. Although the ALJ stated that he had

14

"considered the effects of [Garcia]'s obesity and included those effects within the [RFC] determination" (AR 25), he did not explain what impact Garcia's obesity had on this assessment, or indeed whether it had any impact on Garcia's RFC at all. While the Commissioner proposes a number of reasons why Garcia's obesity may not have affected his RFC or his ability to work (Doc. 22 at 6-9), my review of the ALJ's decision must be based on the reasons stated therein, not on post hoc rationalizations. *See Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004) ("Affirming [a] post hoc effort to salvage the ALJ's decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the administrative process."); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citing *Allen*, 357 F.3d at 1142, 1145).

Because the ALJ failed to adequately address the medical and nonmedical evidence in determining Garcia's RFC, I cannot conclude that his decision was supported by substantial evidence at step four. Moreover, because the ALJ's step-three conclusions rely on this inadequate RFC discussion, I cannot conclude that his decision was supported by substantial evidence at step three. Therefore, this case must be remanded to ensure compliance with SSR 96-8p and SSR 02-1p.

## CONCLUSION

The ALJ erred in his review of Garcia's application for DIB payments by failing to adequately discuss the impact that Garcia's obesity might or might not have had on his other severe impairments and on his ability to work. Accordingly, I grant Garcia's motion to reverse, and I remand this case back to the SSA for proceedings consistent with this opinion.

IT IS SO ORDERED.

　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　William P. Lynch
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.